BENNET FEMALE SEMINARY OF MINNEAPOLIS *vs.* JOSEPH C. WHITNEY.

June 20, 1891.

**Trust.**—Facts considered, and *held* not to show any intention to create a a trust in real estate.

Appeal by plaintiff from an order of the district court for Hennepin county, *Young,* J., presiding, refusing a new trial after judgment ordered for defendant.

*Keith, Evans, Thompson & Fairchild,* for appellant.

*Rea, Miller & Torrance,* for respondent.

GILFILLAN, C. J.[1] The basis of the plaintiff's complaint is that it purchased and owned certain real estate in the city of Minneapolis, and for its convenience the title was first taken and held in trust for it by William W. McNair, and that he conveyed it to defendant in trust for it, and that defendant wrongfully exchanged the real estate for other real estate, receiving also some cash. The action is to com-

[1]Vanderburgh, J., took no part in this decision.

pel an accounting, and a conveyance to it of the real estate thus received in exchange. The action is certainly singular, in this: that at the time of the alleged exchange the defendant was the owner of all the outstanding stock of the plaintiff. So that the action is by plaintiff, claiming that it was the equitable owner of the real estate, against one who was not only the legal owner of the property, but the equitable sole owner of the plaintiff.

The plaintiff was incorporated for the purpose of conducting a female seminary. Under its original articles of incorporation it had no capital stock, and members were admitted by vote. Nothing was done towards carrying out the purpose of the corporation prior to June, 1882, though the organization seems to have been kept up by the election of directors. In June of that year several gentlemen signed a paper, of which this is a copy:

"PLAN FOR THE REORGANIZATION OF BENNET FEMALE SEMINARY.

"The property at the corner of Tenth street and Park avenue, in the city of Minneapolis, known as the 'William E. Jones property,' can be purchased for the sum of fifteen thousand dollars. About fifteen thousand dollars will be needed to make additional improvements, and fit the property for a first-class female seminary. The property can be all bought on time, or so arranged that the purchase-money, fifteen thousand dollars, can all be carried on it at an interest not exceeding seven per cent. Fifteen thousand dollars must then be raised by subscription for permanent improvement. The property so purchased and improved will belong to the subscribers in the proportion of their subscription. To put the school on a proper basis, it should be leased for a term of three years to the parties now having charge thereof, at a rental which will equal the interest on the fifteen thousand dollars purchase-money, and a proper insurance on the building. At the end of three years it will be of such value, and the school so established, that it will doubtless so rent that interest can be paid on the whole sum. The manner in which the ownership of the property shall be held shall be determined by the subscribers to the fund, but it would seem better to act as a corporation, the stock to be distributed in proportion to the subscriptions. Thus all ques-

tions of taxation could be avoided, and the present corporate organization, with the proper changes, could be continued so as to maintain its rights to certain bequests which may be of value.

"We, the undersigned, agree to pay the respective sums set opposite our names for the purpose of carrying out the plan above set forth." · ·　[Signed.]

In November, 1882, the plaintiff's articles of incorporation were amended so as to provide for the issue of $50,000 of stock in shares of $100 each, upon full payment of the same. In March, 1883, the defendant, pursuant to the agreement signed as above, purchased at the price of $15,000, and took to himself a conveyance of, the real estate in the complaint alleged to have been purchased by plaintiff, and also referred to in said agreement. The court below finds as a fact that plaintiff never took any action authorizing or directing the purchase of the property, and we fail to find any evidence of such corporate action. The purchase price of the property was paid by defendant out of the proceeds of a note and mortgage upon the property, executed by him. Afterwards the corporation issued to the signers of said paper stock to the amount of $13,500, that being the aggregate of the sums subscribed by them in said paper, and they paid said sums; and defendant also paid the amount received by him upon said note and mortgage in excess of the purchase price into plaintiff's treasury, and the same was disbursed by the treasurer in making the improvements on the property contemplated by said paper. The property was rented to others than plaintiff, and the rents applied to paying the interest on the note and mortgage, any deficiency being paid by defendant or the other stockholders personally. Plaintiff never used the property for a seminary. Prior to December, 1887, defendant purchased all the stock issued, and received from the stockholders authority to sell and dispose of the property, and he afterwards did so. This is stating the facts as strongly in favor of the plaintiff as the evidence required the court below to find them.

Laying aside the rule that a conventional trust cannot be created in real estate except by deed, the facts do not indicate that there was

any attempt to create such a trust in favor of the plaintiff. It is not material whether the signers of the foregoing paper were or were not all members of the corporation. They were not the corporation, and in signing they acted of their own motion, and not because of any action by the corporation. It is manifest that they intended in some way to aid the corporation,—though in what way is not expressed,— and that the purchase of the property was to be made for that purpose. Possibly they intended eventually to convey the property to it, or to let it have the use of it. But in whatever way they intended eventually to give the corporation the benefit of the purchase, it is beyond question that they intended to hold the property themselves, for the present, at any rate. "The property so purchased and improved will belong to the subscribers in the proportion of their subscription," and "the manner in which the ownership of the property shall be held shall be determined by the subscribers to the fund; but it would seem better to act as a corporation, the stock to be distributed in proportion to the subscriptions." This indicates that, whatever means they might adopt for holding the title, they intended that each subscriber should retain an interest according to his subscription. From the facts that they took stock in this corporation to the amounts they had subscribed for the purchase of the real estate, paid those amounts into its treasury, and that the money was thence disbursed in making the contemplated improvements, it might be inferred that they concluded to hold the property by means of the corporation; possibly to vest the title and use of it for the purposes of its organization. Whatever their intention was in that regard, they did not carry it into effect. They made no change, and did not attempt any, in the prior holding. No right could accrue to the corporation from the mere intention to confer upon it a gratuitous benefaction. It does not appear that any money was used in making the improvements, except what was furnished by the individual stockholders for that express purpose. The most that can be made of the facts is that the purchasers of the property, without expressing any intention to part with the title, or clearly expressing what use they intended to confer on the corporation, resorted to it as a means of disbursing their own money in improving their property. Even had

the corporation paid the money out of the general fund, if it had any, it would not have created an interest, legal or equitable, in the real estate.

Order affirmed.